SEP 22 2026 PM2:16
FILED - USDC - FLMD - TPA

Monique Arge
7836 Tiburon Drive
Largo, FL 33773
FactsBeforeJudgment@proton.me
T: 831-855-8205

*Pro Se,* Plaintiff
Monique Arge

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

MONIQUE ARGE,

Plaintiff,

v.

MARK QUINN,
TOWN OF BELLEAIR,
RICK DOYLE,
BRIAN BEERY,
MIRANDA WINCEK,
JAMES RUDD,
PAUL LANGLOIS,
JOE TORCH,
RICH ROGERS,

Defendants.

**COMPLAINT FOR RELIEF UNDER 42 U.S.C. § 1983 AND RELATED STATE-LAW CLAIMS—DEMAND FOR JURY TRIAL**

Case Number: 8:26-cv-2848-WFJ-SPF

Complaint Filed on September 22, 2026



$405
TPA74920

**TABLE OF CONTENTS**


**I. INTRODUCTION** .......... 3

**II. JURISDICTION AND VENUE** .......... 4

**III. PARTIES** .......... 4

**IV. STATEMENT OF FACTS**

A. Verbal and Text-Message Agreement Regarding Plaintiff's Residence .......... 6

B. Communications Preceding July 7, 2026, and Police Report to Wincek .......... 7

C. Town's Response to "Keep the Peace" Request and Subsequent Events .......... 20

D. Documented Injuries and Continuing Symptoms .......... 26

E. Police-Directed Removal from the Residence .......... 27

F. Town Complaints and Property Loss .......... 27

G. CAD Records and Unredacted Personal Identifiers .......... 32

**V. MUNICIPAL LIABILITY ALLEGATIONS APPLICABLE TO FEDERAL COUNTS** .......... 32

**VI. COUNT I — FIRST AMENDMENT** .......... 35

**VII. COUNT II — FOURTH AMENDMENT** .......... 40

**VIII. COUNT III — FOURTEENTH AMENDMENT** .......... 44

**IX. COUNT IV — ASSAULT** .......... 49

**X. COUNT V — BATTERY** .......... 50

**XI. COUNT VI — CONVERSION** .......... 51

**XII. COUNT VII — TRESPASS TO CHATTELS** .......... 52

**XIII. COUNT VIII — FALSE REPORT TO LAW ENFORCEMENT** .......... 54

**XIV. COUNT IX — DEFAMATION, DEFAMATION BY IMPLICATION AND SLANDER** .......... 56

**XV. DAMAGES** .......... 62

**XVI. PRAYER FOR RELIEF** .......... 66

**XVII. EXHIBITS**

A. Relevant Text Messages Between Plaintiff and Quinn

B. Expectations Going Forward Email to Quinn

C. Officer Wincek Email

## I. INTRODUCTION

1. This civil-rights proceeding arises under 42 U.S.C. § 1983 and concerns violations of Plaintiff's rights secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution, together with related claims arising under Florida law.

2. Plaintiff, newly relocated to Florida from California, sought assistance from the Town of Belleair Police Department during an escalating residential dispute with Defendant Mark Quinn. Plaintiff engaged in protected First Amendment activity throughout the dispute by seeking police assistance, challenging accusations concerning her occupancy and that she was "attempting to commit a crime," objecting to officers' conduct, and petitioning Town officials for redress. On July 7, 2026, after Plaintiff sought police assistance regarding Quinn's escalating conduct, Quinn assaulted her with a laptop tray, causing her to fall backwards down concrete stairs. When officers responded, they exercised governmental authority to effectuate Plaintiff's involuntary dispossession from the residence over her repeated objections and express refusal to leave, notwithstanding the absence of any judgment, writ of possession, court order or other judicial process authorizing termination of her occupancy.

3. As a direct and proximate result of the conduct alleged herein, Plaintiff sustained forced residential displacement; deprivation of possessory and personal-property interests; permanent and total-loss damage to personal property; physical injury and continuing pain; reputational and emotional harm; and substantial economic and consequential losses. Plaintiff seeks compensatory damages; punitive, nominal and statutory damages where authorized; declaratory and prospective injunctive relief to the extent supported by Article III standing and applicable law; taxable costs; reasonable attorney's fees where recoverable and incurred through retained counsel; and trial by jury on all issues so triable.

## II. JURISDICTION AND VENUE

**A. Subject-Matter Jurisdiction**

4. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)–(4), because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

5. This Court has supplemental jurisdiction over Plaintiff's related claims arising under Florida law pursuant to 28 U.S.C. § 1367(a), because those claims derive from a common nucleus of operative fact as Plaintiff's federal claims and form part of the same case or controversy under Article III of the United States Constitution. See *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966).

**B. Personal Jurisdiction**

6. This Court has personal jurisdiction over Defendants. Quinn resides in Belleair, Pinellas County, Florida, and the individual Town Defendants are subject to jurisdiction in Florida based on conduct giving rise to Plaintiff's claims undertaken in Pinellas County in connection with their employment and official duties for the Town of Belleair.

7. The Town of Belleair is a Florida municipal corporation located in Pinellas County, Florida, and is subject to this Court's jurisdiction.

## III. PARTIES

8. Plaintiff, Monique Arge, is an individual who, at all relevant times, resided in Pinellas County, Florida.

9. Defendant Mark Quinn ("Quinn") is a private individual residing in Belleair, Pinellas County, Florida, and the owner of the residence at issue in this action. Plaintiff asserts federal

and state-law claims against Quinn as alleged herein.

10. Defendant Town of Belleair (the "Town") is a municipal entity located in Belleair, Florida, and operates the Belleair Police Department and is sued in its official capacity as a municipal entity.

11. Defendant Rick Doyle ("Doyle") was, at all relevant times, the Chief of the Belleair Police Department and an official of the Town. Doyle is sued in his individual and official capacities.

12. Defendant Brian Beery ("Beery") was, at all relevant times, a Captain of the Belleair Police Department and an official of the Town. Beery is sued in his individual and official capacities.

13. Defendant Miranda Wincek ("Wincek") was, at all relevant times, a patrol officer employed by the Town and assigned to the Belleair Police Department. Wincek is sued in her individual and official capacities.

14. Defendant James Rudd ("Rudd") was, at all relevant times, a patrol officer employed by the Town and assigned to the Belleair Police Department. Rudd is sued in his individual and official capacities.

15. Defendant Rich Rogers ("Rogers") was, at all relevant times, a patrol officer employed by the Town and assigned to the Belleair Police Department. Rich is sued in his individual and official capacities.

16. Defendant Joe Torch ("Torch"), was, at all relevant times, a patrol officer employed by the Town and assigned to the Belleair Police Department. Torch is sued in his individual and official capacities.

17. Defendant Paul Langlois ("Langlois"), was, at all relevant times, a patrol officer employed by the Town and assigned to the Belleair Police Department. Paul is sued in his individual and

official capacities.

## IV. STATEMENT OF FACTS

### A. Verbal and Text-Message Agreement Regarding Plaintiff's Residence

18. Quinn used two different cellular telephones during the relevant period.

19. On April 17, 2026, at 1:34 p.m., Plaintiff texted Quinn: "Reaching out because I am asking those i met here in FL if they know anyone that is trustworthy renting a room? Would be **June 1 for six months temporary**… Online listings are kind of sketchy on Craig's list."

20. At 1:36 p.m., Quinn responded: "Great. How are you? When do you need it? Sure. You wanna come and check it out?"

21. At 1:41 p.m., Plaintiff replied: "It would be June 1. Yes, I would like to. Sometime next week work?"

22. At 1:42 p.m., Quinn responded: "For sure. Just let me know. Where r u working?"

23. At 1:45 p.m., Plaintiff replied: "Im not working yet. I wanted to find a place June 1 and then find a job close to there so I can walk."

24. On April 22, Plaintiff visited Quinn's house in Belleair. She asked the rent amount. Quinn said, "I wasn't planning on charging you." Quinn then asked what she could afford given that she was not working. Plaintiff said $600.

25. On April 23, at 8:34 a.m., Quinn texted: "The pups n I enjoyed seeing you n hanging out. Thanks"

26. At 8:49 a.m., Plaintiff texted: "Good to catch up and **I am very appreciative of you helping me out.** Thank you very much!"

27. At 9:09 a.m., Quinn texted: "You're welcome. Let me know if you need anything. Have a great day!"

28. On June 1, Plaintiff withdrew $600 from her checking account. When she handed Quinn the cash, he said, "Keep the money for food, find a job and get back on your feet. After you have saved a few paychecks, then we can discuss what you can afford. Help take care of the house and pups; I go out of town a lot since I fly for free."

29. Plaintiff re-deposited approximately $500 and texted her sister on June 1st at 12:05 p.m.: "...let me keep the $600 rent for food so I can get my self situated/comfortable."

30. Plaintiff's sister and mother were financing her until she obtained employment—Quinn was aware.

31. On June 2, 2026, Quinn informed Plaintiff that a new restaurant was hiring. Plaintiff independently applied online and did not identify Quinn as a referral or reference. Quinn had no friendship, business relationship or other affiliation with the restaurant's owners. Plaintiff was hired effective June 15, 2026, with the restaurant's soft opening tentatively scheduled for July 15, 2026.

32. The parties' existing housing arrangement remained unchanged: in lieu of monetary rent, Plaintiff would care for Quinn's dogs and deep-clean and maintain designated areas of the residence, with rent payments to begin after Plaintiff received "a few paychecks." Based on the anticipated July 15 opening and corresponding payroll schedule, Plaintiff understood that monetary rent would commence on September 1, 2026.

**B. Communications Preceding July 7, 2026, and Police Report to Wincek**

33. Quinn referred to Plaintiff as "roomie" multiple times in text messages in 2026:

34. May 14 at 5:45 p.m., "Fosho Roomie."

35. May 25 at 12:35 p.m., "Yes I am roomie!!!" "R u ready for 3 new roomies?" and at 12:53 p.m., "Your roomies are excited" with a picture of the dogs.

36. May 31 at 12:38 p.m., "You're welcome roomie."

37. June 16 at 6:57 p.m., "Awesome. Thank you. You are the best roomie."

38. On at least seven occasions, Plaintiff rejected Quinn's attempts to hug her by telling him "no" and explaining that physical hugs made her uncomfortable and that she was not a "hugging person." During these encounters, Plaintiff was positioned with the kitchen table, front door or kitchen countertops behind her. Quinn rapidly approached Plaintiff as she raised her arms, keeping her elbows against her ribs, her hands near her chin, and her forearms across her chest to create physical distance from her breasts. Quinn nevertheless placed his arms around Plaintiff, held her tightly and prolonged the contact. Plaintiff pushed against Quinn in an attempt to disengage and told him, "Okay, that's enough!"

39. On June 20, while she was preparing the dogs' breakfast, Quinn approached Plaintiff from an angle that she could not see, placed both of his hands on her hips and tried to lean into her from behind. Plaintiff jumped to the left and yelled, "What are you doing?!" Quinn did not respond. Plaintiff departed from the house within minutes.

40. On June 21, Quinn said in person, "I didn't mean anything by it, it's just a hug. Everyone needs hugs. You're too uptight from your lawsuit and are overreacting."

41. Plaintiff replied, "No, you put your hands on my hips from behind me and tried to lean into me. Friends don't do that. No more trying to hug me."

42. On June 26, at 6:10 p.m., Quinn texted: "...You ready for an alcohol free mani Pedi? I'm buying on Sunday as a thank you for being so good to the pups."

43. At 6:19 p.m., Plaintiff texted: "That's nice but I am okay. **Part of our deal!**"

44. On June 27, 2026, Quinn returned to the residence after consuming alcohol and demanded Plaintiff to "come outside to say hi to your roomies." Plaintiff was ill and had been confined to

bed. Quinn became aggressive and did not take no for an answer. Plaintiff opened her bedroom door and stood approximately two feet outside the doorway while Quinn sat approximately 11 feet away at the kitchen table.

45. Quinn told Plaintiff that he had prepared dinner for her, consisting of reheated Panera soup in a plastic container. Plaintiff refused, said that she does not eat cream-based soup or food with artificial ingredients and told him she needed to lie down. Quinn then said, "Come give me a hug first!" Plaintiff stepped back quickly towards her door and asserted that there would be no more hugs and locked the door.

46. That night on June 27 at 8:47 p.m. Quinn texted "Get better" with a red heart emoji. At 11:50 p.m. he sent an animated red twirling heart GIF. Plaintiff did not respond to either.

47. On June 28 at 9:42 a.m., Quinn texted: "Wanna take pups to cocos later?"

48. At 9:57 a.m., Plaintiff texted: "No thank you, still not feeling good…"

49. On June 30 at 4:04 p.m., Quinn texted: "Glass of wine tonight?"

50. At 4:07 p.m., Plaintiff texted: "No alcohol for me for a long time. Important time for me, need to be focused and on point!"

51. At 4:10 p.m., Quinn texted: "Ok you blew dried your hair and it looks nice. Thought you might be ready for a glass. All good."

52. At 4:19 p.m. Plaintiff's text message stated in full: " ? Okay... "

53. The next morning on July 1 at approximately 7:20 a.m., while Plaintiff was getting ready, Quinn asked to talk and said: "Since we aren't progressing into a boyfriend and girlfriend relationship, this isn't going to work out."

54. Shocked by the statement, Plaintiff responded, "What are you even talking about? We are friends. What gave you the idea that was even going to happen?" Quinn did not respond and

instead stared at Plaintiff. Plaintiff asked Quinn for time to secure alternative housing and explained that she needed to leave promptly to avoid a lengthy wait at the Tax Collector's office, where she intended to replace her lost driver's license.

55. Quinn became hostile and yelled, "You better not use my address or you will be kicked out immediately!"

56. Plaintiff replied, "Fine, I won't use your address. I need a place to live and you know that I don't have a lot of options."

57. Shortly thereafter at 7:59 a.m., Quinn texted Plaintiff: "From the beginning I said you can't use this address...Please confirm you are not using my home address."

58. At 8:09 a.m., Plaintiff texted: "That's not what was discussed. But since you said you will kick me out immediately if I update my drivers license to your address I wont..."

59. At 8:20 a.m., Quinn texted: "That's exactly what we discussed when we discussed the PO Box. I've help you with a place, a bike and a job please don't make this uncomfortable. I'll work with you."

60. At 8:21 a.m., Plaintiff texted: **"You made this uncomfortable not me."**

61. Plaintiff maintains that Quinn only discussed using his P.O. Box for purchases that might otherwise be left on the porch and stolen.

62. On July 1 at 6:48 p.m., Plaintiff sent an email: "Expectations Moving Forward." Partial quote: "... I am requesting a move-out date of September 1.I accepted this housing agreement between friends because there was never any discussion or indication that a romantic relationship was a condition of the arrangement or an expectation on your part, nor did I ever indicate that I was seeking one with you...Because you stated that you were willing to work with me, I am willing to continue caring for and feeding your dogs when I am here as we have been

doing all along. I will also make reasonable efforts to be out of the house when you are home as weather and transportation permit. Going forward, I expect our communications to be limited to matters relating to the living arrangement. I require that my personal boundaries be respected and that there be no further conduct that makes me uncomfortable or disregards those boundaries.

63. At 6:53 p.m., Plaintiff texted: "I just sent you an email, too long for text."

64. At 7:13 p.m., Quinn texted: "Just to clarify you want to pay the $600/mo rent and move out September 1st or sooner?"

65. At 7:13 p.m., Plaintiff texted: "No, our original agreement but move out sooner. I dont have the money. For sure by sept 1... i am working on sooner."

66. Plaintiff needed to preserve her available funds for a security deposit and first and last month's rent for a new residence. She intended to obtain a six-month lease with a signed contract through a conventional rental arrangement, rather than rely on acquaintances or temporary, informal accommodations.

67. At 7:20 p.m., Quinn texted: "Our original was $600/mo. **I told you to hold onto the $600.** Don't spend it and let's see how we get along. You said you got the money from your sister…"

68. At 7:22 p.m., Plaintiff texted: "You agreed for me to be here and to just help with the dogs...You said today you will work with me. On June 1 you said i can help with the dogs for my part of the rent. I am asking you to keep t[h]at agreement until I find a place to live next to bogeys.. I am trying be out of here ASAP regardless. For sure by Sept 1."

69. At 8:14 p.m., Quinn texted: "Let's talk in the a.m. **I'll feed the pups.**"

70. At 8:14 p.m., Plaintiff texted: "Please just text me. If we need to talk further in person fine, but i am really hurt right now and distressed from the situation and position you put me in."

71. On July 1, Quinn changed the Wi-Fi password, preventing Plaintiff from accessing the internet for her writing projects and legal matters.

72. On July 2, 2026, at approximately 5:15 a.m., Plaintiff left the residence early to avoid Quinn.

73. At approximately 8:55 a.m., Quinn unexpectedly arrived at a café where Plaintiff was present. Plaintiff had not disclosed her location to him. Although Quinn knew of three kratom cafés she regularly frequented, he had never patronized any of them and neither called nor texted Plaintiff before appearing.

74. Plaintiff video-recorded the encounter but, due to the emotional difficulty of reviewing the recording, has not undertaken a verbatim transcription. Based on Plaintiff's recollection, Quinn raised his voice in front of patrons and staff and stated, in substance, "I made a police report against you!" Quinn further told Plaintiff that she had to speak with Wincek at the Town's Police Department "before you return home." A café employee then told Quinn, "You need to leave."

75. Around 40 minutes after leaving the café at 9:42 a.m., Quinn texted: "The officer, Miranda Wincek said to talk to you and get you to voluntarily move out before starting an eviction. **She said with your case pending in CA you definitely don't want an eviction on your record.** Since you were unwilling to talk, she advised me to start the eviction which is what I am doing. I have multiple personal and business accounts with Truist and I am meeting with the manager to see if you fraudulently added my address to your account. You're not to have mail go to my house or use my address for your living address."

76. Plaintiff did not respond.

77. Around 45 minutes later, at 10:27 a.m., Quinn texted: "I'd like you to move out immediately. If you refuse Im going this eviction notice [sic] and pay the fees. I don't feel safe

for myself and my puppies having you stay in this home any longer. I advised Belleair Police of this and they asked if we can work it out. I tried doing that and you refused. **I know you don't want me or this situation interjected into your California lawsuit. Unfortunately if you don't agree to leave that's what will be happening.** This resolve this now [sic]."

78. Plaintiff did not respond.

79. Approximately 51 minutes later, at 11:18 a.m., Quinn texted Plaintiff again but from his other phone: "Please call or text 30 minutes before you pick up your stuff today. I want to make there [sic] is a Belleair Police officer, as I told you, neither I or my puppies feel safe with you here."

80. Plaintiff did not respond.

81. Around 22 minutes later, at 11:43 a.m., Quinn sent an email: "As I told you yesterday - this is not working out with you living here and I need you to leave today. I filed a Belleair Police Report and let the officer know that neither I nor my puppies feel safe with you living here. She asked me to try and discuss this which I tried to do at your Kava Shop. You asked me to leave and I complied which is what I will do if you show up to my house without an invitation. Please notify me 30 minutes before you come to pick up your things so I can make sure there is a police officer here to oversee the move out. As I mentioned at the beginning, **I'm not taking your money** till I see if we can live together and we obviously can't. I attempted to help you out and now you want to make my life miserable. I've notified Truist, US Postal Services and the Pinellas County Tax Collector (DMV) that I am the only adult residing at this address and if anyone changes that then they are doing it fraudulently and will be dealt with accordingly."

82. Plaintiff disputes Quinn's assertion that his acceptance of payment was conditioned upon first determining whether they could live together. Rather, Quinn had stated that he would not

accept payment until Plaintiff "get[s] back on [her] feet."

83. Plaintiff did not respond to any texts or emails.

84. At 1:00 p.m., Plaintiff emailed Wincek and provided an overview of the situation and the verbal agreement. She attached the "Expectations Going Forward" email, which at the time was only Quinn's initial response at 11:43 a.m.; snapshots documenting the six-month temporary housing agreement and related text messages; and the video recording of Quinn confronting her at the café that morning.

85. At 1:52 p.m., Wincek responded: "As I explained to Mr. Quinn, this is a landlord/tenant civil matter. Steps were explained to Mr. Quinn about how to start the eviction process if he wanted to..."

86. At 1:55 p.m., Plaintiff emailed Wincek: "Okay, sorry I didn't know. He said I had to speak with you before returning to the house."

87. At 2:01 p.m., Wincek replied: "No, I didn't say that. If you have further issues today and need a keep the peace feel free to call the non emergency number..."

88. Plaintiff relied on Wincek's direction that she should "feel free" to contact the Department if she "need[s] a keep the peace" and understood that police assistance would be available if needed.

89. At 2:19 p.m. Plaintiff emailed Quinn: "Officer Wincek confirmed that this is a civil landlord-tenant matter... As I have consistently stated, I have been actively searching for alternative housing since yesterday...In the meantime, I ask that we handle this matter reasonably and appropriately. I have no intention of remaining any longer than necessary… I hope we can move through the remainder of this situation respectfully and with dignity. While I remain in the residence, I will stay primarily in the bedroom I have been occupying and will avoid the kitchen

and other common areas as much as reasonably possible."

90. At 2:45 p.m., Quinn responded by email: "No Monique we can't live together another night. I don't feel safe for me or my puppy's [sic] and you have said the same. We didn't have a verbal agreement or a written agreement and you have paid no monies toward rent. I don't want you here without the Belleair Police involvement. I am on hold with them now. Do not come here without them. I need you to collect your clothes and leave."

91. At 2:52 p.m., Plaintiff replied by email: "I disagree with your characterization of the facts...I have never threatened you, been physically aggressive toward you or damaged your property. My only intention is to peacefully remain primarily in the bedroom I have been occupying while I secure alternative housing. **If the Belleair Police Department is present when I am there, I will cooperate with them.**"

92. At 3:03 p.m., Quinn copied Wincek on his email response: "We do not have a verbal or written agreement. I did not take your money or make a verbal or written agreement because I wanted to see if we could get along. We obviously cannot and I and my puppies who have lived here 4 years do not feel safe with you here. Your boyfriend lives less than 5 miles away. I'm asking that if you come here then we need to involve the Belleair Police. **I've lived here 10 years and I know they protect their residents against non residents attempting to commit a crime.**"

93. At 3:06 p.m. on July 2, 2026, less than three hours after Quinn threatened to "interject" himself into Plaintiff's pending California lawsuit if she did not leave the residence (¶ 77), he texted two links without explanation: one to the lawsuit and the other to the Monterey City Council members. Plaintiff understood the messages, sent in direct sequence with Quinn's earlier statement, as reinforcing his threatened interference with her pending litigation and found the

exchange intimidating and alarming. Plaintiff does not know whether Quinn contacted any Defendant in the California action or any employee of the entities named therein.

94. At 5:53 p.m., Plaintiff texted Quinn: "Mark, per your request, I am letting you know that I am leaving Pana."

95. At 5:55 p.m., Quinn texted: "I'm out with the pups. I'll let you know when I'm home. House is locked up. Should be home 8-9...Alarm is on. Should be close to 9. Hopefully Kava is open till then. You're good open till 11."

96. At approximately 6:15 p.m., Plaintiff entered the residence using the key Quinn had given her on June 1. Quinn previously told Plaintiff that the key did not work on the top lock—it did. She never saw an alarm at the residence and no alarm sounded when she entered.

97. On the morning of July 3, 2026, Plaintiff went to use the bicycle that Quinn had allowed her to borrow and discovered that he locked the wheel without notifying her, preventing her from using the bicycle to travel to her birthday appointment. Because she would not have arrived on time if she walked, Plaintiff was forced to cancel the appointment.

98. From July 1 through July 4, 2026, Plaintiff spent approximately ten hours each day at the café to avoid returning to the residence, incurring additional food and beverage expenses. After Quinn's July 2 confrontation at the café, patrons who had previously conversed with Plaintiff stopped doing so, and employees who had regularly socialized with her became noticeably distant and dismissive. The abrupt change caused Plaintiff humiliation and distress.

99. On July 5, 2026, at 10:10 a.m., Plaintiff emailed Quinn: "I have a case of water and food being delivered today from Costco between 2-5p.m.. Reminder that my Truist bank card will be here on or before Tuesday July 7—please leave by the door or under the door. I am actively working on finding a room as you saw I put all my stuff in here so I can [p]ack and be ready—I

fully intend to be out of here sooner than later."

100. At 10:34 a.m., Quinn texted: "R U leaving soon"

101. At 10:35 a.m., Plaintiff texted: "What do you mean? For the day? I sent you an email with an update."

102. At 10:40 a.m., Quinn emailed: "Don't use this address. Period. Get a PO box and use a different address. I've been very clear about this. **Anything addressed to you will be returned. My carrier is fully aware of this.**"

103. At 10:42 a.m., Plaintiff emailed: "I'll be moving out soon—I need food and water, you know I don't have a car. No additional mail will be sent to this address. In the meantime, please do not open, withhold, conceal, destroy or otherwise interfere with any mail addressed to me."

104. At 10:44 a.m., Quinn emailed: "It won't come here it will be returned to sender. I can't make this any clearer to you."

105. At 11:00 a.m., Quinn emailed: "Please move your water and food to the garage fridge"

106. At 11:26 a.m., Plaintiff emailed: "I will keep my food and water where they are until I move out. Please do not move, dispose of or otherwise handle my personal property without my permission. I do not consent to you or anyone touching or relocating my belongings."

107. At 12:00 p.m., Quinn emailed: "I don't want it in my fridge. If you don't move it it will be thrown out"

108. At 12:03 p.m., Plaintiff emailed: "I do not consent to you moving, disposing of or interfering with my personal property."

109. At 12:36 p.m., Quinn emailed: "I've given you another option I'm stocking my and my dogs food and putting a lock on the fridge because as I've told you I don't trust you. This isn't your house and you don't get to choose the refrigerator. The one in the garage will do for you. I

expect it to be moved shortly."

110. The refrigerator in the garage did not maintain a temperature sufficiently cold to safely store dairy products or meat.

111. At 12:51 p.m., Plaintiff emailed: "Once again, and for the final time, I do not consent to you or anyone else: moving, disposing of, withholding, returning, concealing or otherwise interfering with my personal property or mail. If you lock the refrigerator in a manner that deprives me of access to my food and water, remove, discard, damage or withhold my belonging, or interfere with mail addressed to me, I will preserve all available evidence and pursue any civil or criminal remedies…

112. Throughout my time here, I have never threatened you, yelled at you, touched you, damaged your property or engaged in any aggressive or retaliatory conduct. To the contrary, your own text messages acknowledge the care I provided for your dogs and for the substantial work I performed around the home, including deep-cleaning years-old dog feces adhered to the kitchen floor... You even stated that you wanted to 'reward' me for everything I had done. I have consistently acted reasonably and respectfully, have attempted to resolve this situation professionally…

113. Your repeated threats concerning my mail, personal property, food, and access to basic necessities, together with your escalating conduct following my repeated rejection of your unwanted physical advances, have caused me significant emotional distress, made me feel unsafe in the residence, and interfered with my ability to peacefully prepare for my move and begin my new employment. I ask that you cease these threats and leave my personal property undisturbed until I vacate the residence. I will not be responding to any further messages regarding my personal property, food or mail. If there is a legitimate matter requiring communication, do not

approach me or attempt to speak with me in person. Communicate by email only. I consider this matter closed and will not engage in further discussion."

114. At 1:01 p.m., Quinn emailed: "Once again and for the final time any food left in the fridge will be moved and I will be placing a lock on the fridge."

115. Plaintiff did not respond.

116. Around 42 minutes later, at 1:43 p.m., Quinn texted: "My family is coming to visit August 1 and staying in your room. They do this every year. If you're still there. We can break out a tent or a sleeping bag on the floor."

117. Plaintiff did not respond.

118. On July 6, at 12:53 p.m., Quinn emailed: "Your food has been moved to your own fridge and freezer. As I told you I don't want you near my or my puppies food. If any of your food or drink is placed in our refrigerator or freezer it will be immediately thrown out. Please limit any supplies, utensils or other products only to the ones you brought with you. Do not use anything that belongs to me."

119. Plaintiff did not respond.

120. Plaintiff relocated to Florida on November 3, 2023, with only a backpack of personal belongings which consisted of clothing and essential personal-care items. Quinn instructed Plaintiff not to bring utensils, plates or other kitchenware to the residence, representing that he was "fully stocked." In reliance on that representation, Plaintiff declined an offer to receive, at no cost, a complete set of dinnerware and utensils that she otherwise would have accepted given her limited financial resources.

121. From July 1 through July 6, 2026, Quinn simultaneously played televisions in the living room and bedroom at or near maximum volume with his door open which disrupted Plaintiff's

sleep and prevented her from concentrating while reading before bed.

**C. Town's Response to "Keep the Peace" Request and Subsequent Events**

122. Truist's confirmation email identified July 7 as the estimated delivery date for Plaintiff's bank card. After the mail was delivered that day, Plaintiff checked the mailbox and found mail addressed to Quinn, but her bank card was not present.

123. On July 7, within ten minutes of discovering that her bank card was not in the mailbox, Plaintiff went to the Town's Police Department seeking Wincek's assistance in de-escalating Quinn's increasingly aggressive conduct. Plaintiff did not raise eviction, ask Wincek to determine any right to possession, or request assistance concerning a landlord-tenant dispute. Instead, she reported that Quinn had directed the mail carrier to return her mail and told Wincek, in substance, "Mark is escalating. He is harassing me and being very aggressive. He told the mail lady to return my mail, my Truist atm card was supposed to be delivered today. Can you please talk to him before things get worse?"

124. Wincek asked in substance, "How do you know he told the mail lady to return your mail?"

125. Plaintiff responded, "He said it in an email. He also told me that he was friends with her."

126. Wincek declined to speak with Quinn, characterized the matter as a landlord-tenant issue, and stated there was "nothing [she] can do."

127. Plaintiff left the Town's Police Department and returned directly to the residence. She had been gone for approximately 30 minutes. Plaintiff discovered that her belongings had been removed from her room and were spread out along the front entrance. As Plaintiff reached the top stair, Quinn opened the front door carrying Plaintiff's laptop tray, with a clear view of her. Plaintiff's heels were approximately two inches from the top stair. Before Plaintiff could speak,

Quinn yelled, "No, you don't live here!" and used the tray to shove Plaintiff in the chest, causing her to fall directly backwards.

128. The first and most forceful impact was to Plaintiff's lower buttocks, commonly referred to as the "sitting bones," followed by impacts to her lower back and the back of her head. Plaintiff's left wrist and right arm absorbed substantial force as she attempted to brace herself before her head struck the stairs. As Plaintiff tumbled backward down the concrete stairs in a somersault-like motion, she sustained additional cuts and abrasions to her wrists, hands and legs.

129. Plaintiff called 9-1-1. The operator calmed Plaintiff as she was crying and struggling to speak and breathe. Around five officers and one supervisor responded, with the first officers arriving within approximately five minutes.

130. Plaintiff understood the supervisor on site at Quinn's house to be Captain Beery.

131. Plaintiff informed Rogers that Quinn lacked her permission or legal authority to handle or remove her personal property. Rogers responded, "It's okay, your stuff is still on his property." Plaintiff explained that Quinn had no right to enter the room she occupied, disturb belongings she had neatly packed, rummage through her possessions or handle her intimate garments, which she said made her feel violated. Rogers smirked, turned away while Plaintiff was still speaking, and walked towards the residence, leaving her alone.

132. At that time, all officers were inside the residence, in the front entryway or immediately outside after the entrance steps. Each was facing towards each other and Quinn, who was inside the house.

133. Rogers later remarked in a manner Plaintiff perceived as condescending, that men and women cannot live together as friends and that it was "as old as time."

134. An ambulance arrived at the scene, and EMTs took Plaintiff's blood pressure at least

twice and assessed her condition. Plaintiff declined transport to the hospital because she did not want to leave her property unattended and did not have health insurance.

135. Plaintiff recognized one of the responding EMTs as an individual she had seen at the police station approximately one hour earlier, when she went there to ask Wincek to "keep the peace." Plaintiff stated, "Wasn't I just at the station? This is exactly why I was there. Had someone just talked to him and put him in his place, it never would have gotten to this point."

136. Plaintiff told both of the EMTs, "They are friends with him, they aren't going to do anything."

137. One of the EMTs asked Plaintiff, "Which one?"

138. Plaintiff pointed and said, "That one in the middle." Both EMTs turned toward the officers, who stood directly behind them facing Plaintiff. She added, "It's probably all of them though . . . protecting their own."

139. Plaintiff did not record the officer's statement she had overheard earlier that day and does not presently recall the remainder of what she relayed to the EMTs. The quoted statements above, however, reflect the portions of that exchange Plaintiff specifically remembers.

140. Plaintiff asserts that she only observed one EMT at the Police Department shortly before the assault-and-battery call and does not contend that the EMT overheard her conversation with Wincek.

141. Wincek and Rudd examined Plaintiff's scratches and other visible injuries, remarking that they appeared more consistent with a sideways fall than her report of having gone directly backwards down the stairs. They advised that Quinn acknowledged she had fallen but denied pushing her. Plaintiff understood their assessment as rejecting her version of events and suggesting that she had caused her own injuries.

142. Torch was standing inside the residence at the front doorway, facing the street. He turned toward Quinn who was inside the house and handed him a garbage bag that, based on the sound it made, Plaintiff understood to contain her baking pans and glass measuring cup. At Quinn's direction, Torch placed the bag outside the house on the stairs. Quinn then handed Torch a second garbage bag containing Plaintiff's clothing and/or shoes. Because there was no room remaining on the first step outside, Torch placed the second bag farther down the stairs.

143. Plaintiff told all officers that she was not leaving, that she had done nothing wrong, and that Quinn should be arrested for assaulting her.

144. Langlois responded, "You are not staying here. You have no choice. You don't have to take all your stuff with you today. But we are not leaving you here."

145. Plaintiff asked, "So there are no other options? You aren't even considering the fact that he shoved a woman down the stairs?"

146. Rudd responded,"It's your word versus his."

147. Plaintiff replied, "What guy is going to admit to the police that he pushed a woman down the stairs so he can get arrested?"

148. Wincek told Plaintiff to "just go to a women's shelter." Rudd and Langlois agreed, telling Plaintiff that a women's shelter "is your best option."

149. Plaintiff responded, "A women's shelter is not an option. I am not leaving. I did nothing wrong. I am the victim that was just assaulted." Plaintiff reiterated to the officers that she believed they were protecting Quinn because they were friends with him and because he had lived in Belleair for ten years.

150. Plaintiff informed Rudd that text messages, photographs, and video recordings existed and were available to corroborate her account. Rudd dismissed Plaintiff's statements and did not

request or review the evidence she identified before the officers proceeded with their decision to remove Plaintiff from the property.

151. Wincek moved Plaintiff directly across the street from Quinn's residence, positioning her beyond hearing range of the officers' communications with Quinn, and remained there with Plaintiff. A female neighbor first came outside and brought them water. Minutes later, a male neighbor from that side of the street approached and asked what had happened. Plaintiff told him that Quinn pushed her down the stairs and that she believed the Town's officers were friends with him. Wincek stood approximately two feet to her right throughout the exchange and did not say one word.

152. Rudd interrupted Plaintiff and said, "Look, we all have the same shoes!" while swinging his foot in the air and laughing as he and Wincek discussed how comfortable "OnCloud" shoes were.

153. The officers' conduct made her feel that they were treating the encounter as a casual social occasion rather than responding seriously to her assault.

154. The officers appeared to be in a hurry to leave. Plaintiff recalls one officer commenting on another patrol shift or shift change, something to that effect.

155. Langlois said, "We asked Mark to get you a hotel room for a couple of nights."

156. Plaintiff replied, "No, I am not leaving. There is no way. A couple of nights and then what?"

157. In a commanding manner Langlois asserted, "You have to be reasonable, he doesn't even have to get you a hotel room."

158. Plaintiff said, "No, I am not leaving. I don't care if he is getting a room for two nights. I have nowhere to go after that. What am I going to do with all my stuff and no car?"

159. Langlois returned inside the residence and later came outside to advise Plaintiff that he had asked Quinn to provide a hotel room for two weeks. Plaintiff reiterated that she did not want to leave and stated that, if she was being forced to move out, Quinn should pay for three weeks rather than two.

160. Plaintiff thereafter complied with the officers' directives, consistent with her July 2 email to Quinn at 2:52 p.m. stating that she would cooperate if police were present.

161. Torch stated that he had confirmed with Quinn that all of Plaintiff's property was already outside. Plaintiff had not asked Torch or any other officer to act on her behalf concerning her belongings, communicate with Quinn about them, verify their location, determine whether they had been removed or otherwise intervene in their handling. These communications and actions occurred without Plaintiff's prior knowledge, request, authorization, permission or consent.

162. Because the officers had instructed Plaintiff to stay outside and not enter the residence, Plaintiff asked Wincek to accompany her inside so that she could "double check" for any remaining belongings. Once inside, Plaintiff found a blanket on the bed, her diary inside a pillowcase, several articles of clothing in the closet and her portable Bose speaker. Wincek ordered her at least three times to "hurry up," which caused Plaintiff additional anxiety and distress.

163. Langlois instructed Plaintiff to move her belongings from the stairs to the end of the driveway so that she would be ready for the Uber. Immediately thereafter, Wincek, appearing impatient to leave the scene, handed Plaintiff a victim-statement form to complete. The other officers suggested that they could bring the finished report to the station so Wincek could depart, but Wincek responded that she would wait for Plaintiff to finish it. Another officer then indicated that they understood why Wincek wanted to remain since her name was on the report.

164. During this time, Langlois received Uber updates from Quinn and called them out from the entrance of the residence at least four times. The vehicle was delayed because Langlois had directed Quinn to order an Uber XL to accommodate Plaintiff's belongings and bicycle that she recently purchased.

165. Langlois told Plaintiff that, if the bicycle did not fit, she would have to leave it behind. Plaintiff refused, explaining that she would not depart without it because it was her only means of transportation. Langlois appeared irritated and repeatedly told Plaintiff that she was being "difficult."

166. While Plaintiff was completing the victim statement, Langlois, in an audibly impatient tone, ordered her for a second time to relocate her property to the end of the driveway. Plaintiff was thus simultaneously pressed by Wincek to complete the statement and by Langlois to move her belongings, while still in shock from the reported assault and visibly distressed.

167. Approximately three minutes before the Uber arrived, Plaintiff remembered that her second diary, a grey-blue leather notebook she had hidden beneath the bed, might still be there. For the first and only time, she asked the officers present to retrieve the sensitive notebook. Prior to that point, she had neither asked nor authorized Torch or any other officer to enter on her behalf, communicate with Quinn concerning her belongings, ascertain whether her property had been removed or otherwise handle any of her possessions.

**D. Documented Injuries and Continuing Symptoms**

168. During the initial response, Wincek and Rudd told Plaintiff that bruising would develop. Several hours after the incident, Plaintiff experienced pain on her buttocks and her lower back, and observed two large areas of pink discoloration on the lower portion of each buttock at approximately the same horizontal level. Plaintiff photographed the injuries on July 7 and on

sporadic days thereafter. The discoloration became a darker bruised color and more distinct over the following days which remained visible as of August 14, 2026. Plaintiff did not seek medical treatment due to the expense and because she does not have health insurance.

169. As of September 20, 2026, Plaintiff continues to experience pain in her lower back and buttocks, particularly when sitting or standing for extended periods, riding her bicycle or lying in certain positions. While working at a computer, she must stand approximately every 30 minutes to alleviate the discomfort and uses a pillow when seated for prolonged periods while writing. Since Bogey's Tavern opened on August 25, Plaintiff has worked shifts requiring her to remain standing for at least six hours and, at times, as long as nine hours which aggravates the pain.

**E. Police-Directed Removal from the Residence**

170. Plaintiff repeatedly stated that she would not leave and expressly objected to the officers' directives that she vacate Quinn's residence. Despite her refusal, they informed her that she had no choice but to depart and facilitated the transfer of her belongings without her knowledge, permission or consent. Plaintiff never voluntarily surrendered, relinquished or abandoned her occupancy or possessory interest. No judgment for possession, writ of possession, court order or other judicial process authorizing her removal was furnished, and no sheriff was present to execute such process.

**F. Town Complaints and Property Loss**

**1. Initial Complaint**

171. At 4:15 p.m. on July 7, 2026, after discovering personal property missing, Plaintiff emailed Wincek because she understood Wincek's statement that her "name was on the report" to mean she was the officer in charge. Wincek directed Plaintiff to call the Department's non-emergency number, stating, "Any on duty officer will assist you."

172. At 10:10 p.m. on July 8, 2026, Plaintiff submitted a written complaint to Doyle, the Town's Chief of Police, entitled "Officer Wincek's Notice, Failure to Act and Preventable Escalation," concerning Wincek's handling of Plaintiff's earlier request for "keep the peace" assistance and seeking review of her conduct. Plaintiff also requested the Department's help recovering property withheld by Quinn and reported, "I have photographs documenting my injuries. The bruising to my buttocks was taken at approximately 6:14 p.m. on July 7, 2026. Because the photographs depict private areas of my body, I am not attaching them to this complaint, but I will make them available for in-person review...."

173. Doyle did not acknowledge receipt of Plaintiff's July 8 complaint.

174. On July 9, 2026, Wincek emailed Plaintiff: "I gathered your laptop, haircare items, suitcase and miscellaneous other items. They are available for pickup at the Belleair Police Department... You'll need to sign a property release form."

**2. Recovery and Condition of Property**

175. When Plaintiff arrived at the Town's Police Department on July 13, 2026, she overheard someone say, "You know, that email that went out to the department about her property stored in Beery's office."

176. Rudd brought Plaintiff's property to her at the Department's main entrance or reception area. Among the belongings was an approximately 18-by-24-inch hand-drawn illustration on tracing paper, created by a retired artist. The artwork had been tightly crumpled into a ball, ripped and stuffed into a pocket of Plaintiff's luggage. Plaintiff immediately recorded on video in Rudd's presence and directed his attention to the damage. Rudd neither examined the piece, noted its condition, nor responded to her concerns.

177. The illustration was commissioned to commemorate the publication of Plaintiff's first

book, which represented her most significant professional and personal achievement. It was one of two original works conceived and produced as successive stages of a single artistic project, with both pieces designed to remain together as a complete set. The damage rendered the illustration unusable for that purpose, destroyed its unique personal and artistic value to Plaintiff, and diminished the significance of the surviving companion piece.

178. The damaged illustration cannot be restored to its prior condition or replaced in a manner that preserves the original two-piece work. The artist is retired, and commissioning another artist would neither replicate the original artist's style nor restore the companion pieces as a unified work by the same artist. A replacement would therefore lose the artistic continuity, collaboration, and personal significance inherent in the original pairing. Accordingly, the total-loss of the destroyed illustration as part of the two-piece work is permanent.

179. Rudd handed Plaintiff a form containing a basic description of her property, which he transcribed in front of Plaintiff as: "2 white garbage bags of misc items; 1 picture frame w/ 14" 6x14 picture; 1 black suitcase with misc clothing; 1 Lenovo laptop gray; 1 adidas duffle bag black."

180. Rudd did not specifically identify the crumpled artwork as an item received or note its damaged condition. Plaintiff therefore wrote on the form, substantially as follows: "property damage—one of a kind 'trace' paper by artist for my comic book—non-replaceable. Need to confirm if more damages to the other."

181. Plaintiff was visibly upset and physically trembling, showed Rudd her shaking hand, and verbally expressed her distress. Rudd neither responded nor looked at her.

**3. Location of Property Before Town's Possession**

182. On July 5, 2026, Plaintiff moved all of her belongings from the garage, kitchen, and

bathroom into the bedroom she occupied, where she placed them on the floor or in and on the dresser. The dresser also contained Plaintiff's clothing and intimate garments. That day, Plaintiff emailed Quinn, "I put all my stuff in here so I can [p]ack and be ready," as stated in ¶ 99, and recorded a short video that depicts her black suitcase and other belongings on the bedroom floor.

183. On July 7, when Plaintiff later entered the bedroom with Wincek to check for remaining belongings, the property that subsequently came into Town custody was no longer where Plaintiff had left it and was not among the items placed outside the residence. Plaintiff had neither moved nor relinquished those possessions and had not given Quinn or anyone permission or authority to handle them, remove them from the room, relocate them elsewhere or transfer them to another person or entity.

184. The disappearance of Plaintiff's property from the bedroom, its absence from the belongings placed outside, and its subsequent delivery to Town custody support the reasonable inference that Quinn took possession of the items, removed them from the room Plaintiff was occupying, retained them outside her knowledge and access and later transferred them to the Town's police.

**4. Supplemental Complaint and Department Property Records**

185. On July 15, Plaintiff submitted a supplemental written complaint and public-records request to Doyle and copied Town administrative personnel. Doyle confirmed receipt on July 17 and stated that Beery was reviewing "all aspects" of Plaintiff's complaint.

186. On July 22, 2026, Beery stated that Department records reflected that Plaintiff had "voluntarily departed"—Plaintiff categorically disputes that characterization.

187. The Department produced no contemporaneous inventory identifying the property Wincek received from Quinn; no inventory, receipt or other acknowledgment signed by Quinn

memorializing what he transferred; no documentation reflecting the condition of the items upon receipt; no photographs or video depicting the condition at that time; and no records identifying where the belongings were stored or who had access to them while in Department custody.

188. Beery only produced the property receipt signed by Plaintiff and an email that Wincek sent to Plaintiff and stated, "No additional responsive records were located." Beery represented that Wincek had "retrieved the property and returned it as she received it, in the condition in which Mr. Quinn delivered it to her."

**5. State Attorney Referral**

189. On July 7, 2026, Wincek informed Plaintiff that Plaintiff's statement, Quinn's report, photographs officers had taken of Plaintiff's injuries, and other evidence collected concerning the incident would be submitted to the State Attorney's Office for a determination whether criminal charges would be pursued.

190. In her July 8 complaint to Doyle, Plaintiff reported that additional bruising had become visible on her lower buttocks—consistent with her account that Quinn had shoved her directly backwards—it was the first location of impact.

191. Despite that notice, no one from the Department contacted Plaintiff to obtain or review the additional injury photographs which corroborated her account, or conduct a supplemental interview before the Department treated its investigation as sufficiently complete for referral to the State Attorney's Office.

192. On July 23, 2026, Plaintiff asked Doyle and Beery to identify the factual basis upon which the investigation had been considered sufficiently complete for referral; whether the referral occurred before or after Doyle learned that the additional injury photographs existed and were available for review. Neither Doyle, Beery, nor Lancaster responded.

**G. CAD Records and Unredacted Personal Identifiers**

193. On July 22, 2026, in response to Plaintiff's public-records request, the Town electronically transmitted CAD records to Plaintiff containing the full, unredacted Social Security numbers of both Plaintiff and Quinn.

**1. CAD Incidents: Civil Matter | BE26.007438 | Unit BE54**

194. July 2, 2026—Entries Beginning at 8:23:40 a.m.

195. "HAS A FRIEND HE WAS HELPING SHE WAS LIVING THERE FOR 30 DAYS" 08:23:40

196. "WAS SUPPOSED TO BE GONE JUN 30 AND IS STILL AT LOC" 08:23:40

197. "WANTS TO KNOW IF HE HAS TO EVICT" 08:26:31

198. "RP ADVISED HE WAS GOING TO ASK SUBJ AGAIN TO VACATE RESIDENCE AND WAS GIVEN THE STEPS FOR EVICTION PROCESS" 08:52:21

**2. CAD Incidents: Assault / Battery | BE26-007767**

199. July 7, 2026—Arrival at 1:28:25 p.m.

200. "ROOMMATE PUSHED RP DOWN THE STAIR - MALE ROOMMATE" 13:25:10

201. "RP DECLINED SUBJS ROMATIC ADVANCE AND SUBJ THEN STARTED KICKING RP OUT" 13:26:40

**V. MUNICIPAL LIABILITY ALLEGATIONS APPLICABLE TO FEDERAL COUNTS**

202. Plaintiff does not seek to impose liability upon the Town under respondeat superior. Municipal liability under 42 U.S.C. § 1983 attaches only where a constitutional deprivation is caused by an official policy; a persistent and widespread custom or practice having the force of law; or a deliberate decision attributable to an official possessing final policymaking authority over the particular governmental function at issue. The municipal policy, custom, practice or

attributable decision must cause and constitute the moving force behind the constitutional injury. See *Monell v. Department of Social Services*, 436 U.S. 658, 690–94 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–84 (1986).

203. Plaintiff does not allege that the number of participating officers, Beery's supervisory rank, or the July 7 incident standing alone establishes a widespread municipal custom. Rather, those circumstances bear upon whether the challenged exercise of police authority constituted coordinated departmental action attributable to the Town rather than independent or idiosyncratic conduct by a single subordinate employee.

204. The Department had become involved in the same disputed residential occupancy beginning July 2. On July 7, six Town law-enforcement officers, including Captain Beery, participated in a coordinated response during which Plaintiff repeatedly asserted her possessory rights, objected to the officers' authority, and expressly refused to relinquish possession. Notwithstanding those objections, the officers collectively exercised governmental authority concerning Plaintiff's continued access to the residence, removal and relocation of her belongings, transportation and compelled departure. The Department thereafter officially characterized Plaintiff as having "voluntarily departed."

205. Based upon the coordinated and uniform exercise of governmental authority asserted herein, Plaintiff maintains that the challenged course of conduct was undertaken pursuant to Town-attributable policy, direction or authorized departmental action rather than solely through the isolated acts of individual employees. The existence, source and scope of any written or unwritten policy, directive, authorization or governing departmental practice are matters principally within the Town's possession and control. At the pleading stage, § 1983 does not invariably require identification by name of the ultimate final policymaker where the factual

allegations otherwise plausibly establish a municipal policy, practice or custom causing the constitutional deprivation. See *Hoefling v. City of Miami*, 811 F.3d 1271, 1279–81 (11th Cir. 2016).

206. Independently, a single governmental decision may constitute municipal policy where the decision is made, directed or adopted by an official possessing final policymaking authority over the particular governmental function involved. Such authority is determined by state and local law, is specific to the subject matter at issue, and is not established merely by supervisory title, operational discretion or rank. See *Pembaur*, 475 U.S. at 481–84; *Chabad Chayil, Inc. v. School Board of Miami-Dade County*, 48 F.4th 1222, 1229–30 (11th Cir. 2022).

207. Belleair's Charter vests Town powers in the Town Commission, designates the Town Manager as the chief administrative officer, authorizes the Manager to direct and supervise Town departments, and provides that department heads remain subject to the Manager's direction and supervision. See Belleair Charter §§ 2.06(a), 3.05(b), 3.06–3.07. Plaintiff therefore does not predicate municipal liability upon rank alone. To the extent the challenged exercise of police authority was made, directed, authorized or adopted by the official or body possessing final policymaking authority over the governmental function at issue, that decision constitutes municipal policy where it caused the constitutional deprivation alleged in the applicable federal Count. See *Pembaur*, 475 U.S. at 480–84.

208. The Department's post-incident treatment of the July 7 conduct is alleged as corroborative evidence relevant to municipal attribution and the institutional treatment of the challenged governmental action. Plaintiff does not rely upon a subsequent failure to investigate, standing alone, as establishing municipal ratification. See *Salvato v. Miley*, 790 F.3d 1286, 1296–98 (11th Cir. 2015).

## VI. COUNT I — FIRST AMENDMENT (42 U.S.C. § 1983)

**Retaliation for Protected Petitioning and Speech Activity**

**Defendants:** Mark Quinn, Town of Belleair, Rick Doyle, Brian Beery, Miranda Wincek, James Rudd, Paul Langlois, Rich Rogers and Joe Torch.

209. Plaintiff realleges and incorporates by reference paragraphs 18 through 208 as though fully set forth herein.

**A. Protected Activity and Retaliation Standard**

210. A First Amendment retaliation claim requires constitutionally protected speech or petitioning activity; adverse governmental action that would likely deter a person of ordinary firmness from exercising those rights; and a causal connection establishing that the protected activity was a but-for cause of the adverse action attributed to the particular Defendant. See *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288–89 (11th Cir. 2019); *Bennett v. Hendrix*, 423 F.3d 1247, 1250–54 (11th Cir. 2005); *Huggins v. School District of Manatee County*, 151 F.4th 1268, 1281–84 (11th Cir. 2025).

211. Plaintiff engaged in protected speech and petitioning activity by challenging Quinn's representations concerning her occupancy and that she was "attempting to commit a crime"; seeking police assistance; reporting the assault and battery; identifying corroborating evidence; criticizing the officers' treatment of Quinn and exercise of governmental authority; objecting to her compelled displacement and interference with her property; and petitioning Town officials for governmental review and redress. See *City of Houston v. Hill*, 482 U.S. 451, 461–63 (1987); *Bailey v. Wheeler*, 843 F.3d 473, 480–86 (11th Cir. 2016).

**B. Defendant-Specific Knowledge, Adverse Action and Causation**

212. Individual liability is based upon each Defendant's own knowledge and conduct. Plaintiff

does not impute knowledge, retaliatory motive or constitutional liability among Defendants. As to each individual Defendant, Plaintiff alleges that protected activity actually known to that person was a but-for cause of the materially adverse conduct personally undertaken, authorized or affirmatively caused by that Defendant. See *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 678 (2009); *Huggins*, 151 F.4th at 1282–84.

213. **Wincek.** Wincek possessed direct, preexisting knowledge of Plaintiff's July 2 communications challenging Quinn's account, the supporting documentation Plaintiff supplied, and Plaintiff's July 7 request for the "keep the peace" assistance Wincek had previously offered—Wincek denied her renewed request for that assistance. After Plaintiff subsequently criticized the officers' intentions and exercise of police authority, Wincek participated in preventing Plaintiff from reentering the residence, controlled her limited access to retrieve belongings, and effectuated the compelled departure Plaintiff opposed.

214. **Langlois.** Langlois personally received Plaintiff's report of assault and battery and heard her criticism of the police response, challenge to the officers' authority, and express refusal to leave. Thereafter, he ordered Plaintiff to depart, stated that she had "no choice" coordinated directly with Quinn concerning lodging and transportation without Plaintiff's knowledge, request or consent, and directed the relocation of her belongings to facilitate the compelled departure.

215. **Rudd.** Rudd personally received Plaintiff's criticism, identified corroborating evidence, objections to the officers' authority and repeated refusal to leave. Thereafter, he reinforced the compulsory-departure directive and continued participating in the coordinated governmental action effectuating Plaintiff's displacement.

216. **Rogers.** Rogers possessed direct knowledge of Plaintiff's objections to her removal and to Quinn's interference with her property. Notwithstanding those objections, Rogers

affirmatively treated Quinn's conduct as permissible and continued participating in the governmental course of action facilitating Plaintiff's dispossession.

217. **Torch.** Torch acquired contemporaneous knowledge of Plaintiff's objections and refusal to relinquish possession. He thereafter independently communicated with Quinn concerning Plaintiff's belongings, took physical possession of property from inside the residence without her permission, knowledge or request, and materially participated in its removal while Plaintiff's objections remained ongoing.

218. **Beery.** Beery personally heard Plaintiff's criticism of preferential treatment toward Quinn, objections to the officers' authority and repeated refusal to depart. While exercising on-scene supervisory authority, he permitted the challenged governmental action to continue through Plaintiff's compelled departure and interference with her possessory interests and property. His liability is predicated upon his own contemporaneous knowledge and causal participation, not rank or respondeat superior. See *Keating v. City of Miami*, 598 F.3d 753, 762–65 (11th Cir. 2010).

219. **Doyle.** Doyle acquired actual knowledge of Plaintiff's protected petitions through her written complaints challenging the officers' conduct and requesting governmental review. Plaintiff predicates Doyle's individual liability only upon materially adverse actions personally undertaken, directed or authorized after acquiring that knowledge and causally connected to Plaintiff's protected petitions, including his placement of the Department's review under Beery notwithstanding Beery's asserted supervisory participation in the conduct being challenged. Plaintiff does not predicate this claim upon Doyle's supervisory status or upon a freestanding constitutional entitlement to a particular investigative result.

220. The causal inference as to the foregoing Defendants rests upon the pleaded chronology;

defendant-specific knowledge; the close temporal relationship between protected activity and adverse conduct; contemporaneous statements and actions; and the continuation or escalation of governmental action after Plaintiff criticized, challenged or petitioned the officials involved. As to Wincek, causation is further supported by her preexisting July 2 knowledge, prior characterization of the occupancy dispute as civil, earlier offer of "keep the peace" assistance, Plaintiff's July 7 invocation of that assistance, and Wincek's subsequent participation in the compelled displacement. See *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019); *Huggins*, 151 F.4th at 1282–84.

221. Compelled residential displacement, coercive exercise of police authority, restriction of access and governmental interference with possessory interests constitute materially adverse conduct when undertaken in retaliation for protected speech or petitioning activity because such governmental consequences would likely deter a person of ordinary firmness from exercising First Amendment rights. See *Bennett*, 423 F.3d at 1254–55; *Huggins*, 151 F.4th at 1281–82.

**C. Joint Action — Quinn**

222. Although Quinn is a private individual, Plaintiff alleges § 1983 liability only to the extent he knowingly and willfully participated with Town officials in adverse governmental action undertaken in retaliation for protected activity. Quinn possessed direct knowledge that Plaintiff challenged his representations concerning her occupancy, invoked law-enforcement assistance, and opposed the account he supplied Town personnel. Thereafter, Quinn affirmatively sought police intervention to secure Plaintiff's departure and materially advanced that objective by providing representations that Plaintiff was "attempting to commit a crime" and coordinating with responding officers concerning her removal, transportation and property. His conduct thereby extended beyond requesting neutral police assistance and materially participated in the

state-assisted dispossession Plaintiff expressly opposed.

223. To the extent Quinn jointly participated with officials exercising governmental authority in effectuating retaliatory action that would not otherwise have occurred but for Plaintiff's protected activity, his conduct constitutes action under color of state law for purposes of § 1983. Quinn's purely private conduct, standing alone, is not pleaded as a First Amendment violation. See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–42 (1982); *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263, 1277–78 (11th Cir. 2003).

**D. Municipal Liability — Town of Belleair**

224. Plaintiff incorporates the municipal-liability allegations set forth in paragraphs 202 through 208. The Town-attributable policy, custom, authorized governmental action or deliberate decision alleged in paragraphs 202 through 208, together with the incorporated factual allegations supporting municipal attribution, caused and was the moving force behind the Fourth Amendment deprivation alleged in this Count. See *Monell v. Department of Social Services*, 436 U.S. 658, 690–94 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–84 (1986).

**E. Scope of Claim and Resulting Injury**

225. Plaintiff does not predicate this Count upon a freestanding First Amendment right to compel investigation, arrest, prosecution, evidence collection, preservation, referral or a favorable governmental response. Such allegations are relevant only insofar as they establish protected petitioning activity, defendant-specific knowledge, retaliatory causation or materially adverse governmental conduct.

226. As a direct and proximate result of the retaliatory conduct alleged in this Count, Plaintiff sustained involuntary displacement, interference with possessory interests, emotional distress, humiliation, loss of security, consequential economic harm and other legally cognizable injuries.

**VII. COUNT II — FOURTH AMENDMENT UNREASONABLE SEIZURE**

**(42 U.S.C. § 1983)**

**Defendants:** Mark Quinn, Town of Belleair, Rick Doyle, Brian Beery, Miranda Wincek, James Rudd, Paul Langlois, Rich Rogers and Joe Torch.

227. Plaintiff realleges and incorporates by reference paragraphs 18 through 208 as though fully set forth herein.

**A. Protected Possessory Interests**

228. At the time of the challenged conduct, Plaintiff maintained existing possessory interests in the residence and in the personal property located therein. As asserted above, she possessed a key, exclusively occupied a designated bedroom, maintained her belongings at the residence, received mail and deliveries there, and had neither abandoned nor voluntarily surrendered possession. The parties' dispute concerning the legal characterization or terms of Plaintiff's occupancy did not extinguish the possession she was actually exercising.

229. The Fourth Amendment protects against unreasonable governmental seizures of houses and effects. A seizure occurs when governmental action meaningfully interferes with an individual's possessory interests, independently of any separate privacy intrusion, and encompasses governmental participation in dispossession from a home or deprivation of control over personal property. See *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *Soldal v. Cook County*, 506 U.S. 56, 61–72 (1992); *Hoefling v. City of Miami*, 811 F.3d 1271, 1280–81 (11th Cir. 2016).

**B. Governmental Seizure and Personal Participation**

230. Wincek, Rudd, Langlois, Rogers, Torch, Doyle and Beery acted under color of state law when exercising authority made possible by their positions with the Town's Police Department.

See *West v. Atkins*, 487 U.S. 42, 49–50 (1988).

231. Plaintiff repeatedly and expressly refused to relinquish possession, challenged the officers' authority to compel her departure, and stated that she was leaving only because they were requiring her to do so. Her submission to asserted police authority did not constitute voluntary surrender, consent or abandonment. The ensuing governmental conduct meaningfully interfered with Plaintiff's continued residential possession, access to the residence, and possession and control of her personal effects.

232. The individual Defendants materially participated in that seizure through their respective conduct alleged in the incorporated factual allegations, not limited to: Langlois commanded Plaintiff to depart and coordinated the arrangements effectuating her removal; Wincek prevented Plaintiff from reentering the residence, relocated her across the street beyond hearing range of the officers' communications with Quinn before Langlois and Quinn arranged alternative lodging, and controlled her limited access to retrieve belongings; Torch physically removed and relocated her personal property from inside the residence to outside; Rudd reinforced the compulsory-departure directive; Rogers affirmatively facilitated Quinn's exercise of control over Plaintiff's belongings despite her express objections; and Beery exercised on-scene supervisory authority with contemporaneous knowledge of Plaintiff's repeated refusal to relinquish possession while the coordinated dispossession proceeded.

233. Liability against each individual Defendant is predicated upon that person's own participation in, direction or authorization of, or affirmative causal contribution to the challenged seizure, and not upon collective attribution, title, presence or respondeat superior. See *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Keating v. City of Miami*, 598 F.3d 753, 762–65 (11th Cir. 2010).

**C. Objective Unreasonableness**

234. The seizures were objectively unreasonable. Reasonableness under the Fourth Amendment requires balancing the nature and extent of the interference with Plaintiff's possessory interests against the governmental interests asserted to justify that intrusion. See *Soldal*, 506 U.S. at 71–72; *Hoefling*, 811 F.3d at 1280–81.

235. Although Town officers responded on July 7 to Plaintiff's reported assault and battery, that law-enforcement purpose did not itself authorize them to resolve the parties' separate possessory dispute by compelling Plaintiff to relinquish residential possession or control of her personal property. No judgment for possession, writ of possession, court order, warrant or other judicial process authorized the officers to terminate Plaintiff's occupancy or effectuate the dispossession she repeatedly opposed.

236. Nor was the challenged interference limited to neutral police presence or temporary measures reasonably necessary to secure the scene. As alleged above, the officers affirmatively exercised governmental authority to compel Plaintiff's departure, restrict continued residential access, direct and facilitate relocation of her belongings, and physically interfere with her possession and control of personal property. See *Soldal*, 506 U.S. at 60–72; *Booker v. City of Atlanta*, 776 F.2d 272, 273–74 (11th Cir. 1985); cf. *Cofield v. Randolph County Commission*, 90 F.3d 468, 471–72 (11th Cir. 1996).

237. Florida law further prohibited a landlord, where applicable, from preventing reasonable access to a dwelling or removing a tenant's personal property before surrender, abandonment or lawful eviction. See Fla. Stat. § 83.67(2), (5). Plaintiff does not predicate her Fourth Amendment claim upon a violation of state law standing alone; those provisions are relevant to the nature of her possessory interests, the absence of lawful authority for immediate dispossession, and the

objective reasonableness of the governmental interference alleged.

**D. Joint Action — Quinn**

238. Although Quinn is a private individual, Plaintiff alleges § 1983 liability based upon his knowing and willful joint participation with Town officers in effectuating the governmental seizure challenged in this Count. His conduct extended beyond reporting a dispute or requesting neutral police assistance. As asserted in the incorporated factual allegations, Quinn affirmatively sought Plaintiff's removal, characterized her conduct to Town personnel as an attempted crime despite the ongoing civil possessory dispute, and continued pursuing official intervention while Plaintiff asserted her right to remain and expressly refused to relinquish possession.

239. Quinn thereafter coordinated directly with responding officers concerning Plaintiff's departure, lodging, transportation, and property while Town officers exercised governmental authority to compel her removal, restrict continued residential access, and facilitate the loss of possession and control over her belongings. His representations to law enforcement and subsequent coordination formed part of the course of conduct through which he sought and obtained governmental assistance to effectuate Plaintiff's dispossession. The result Quinn sought could not have been accomplished in the manner alleged through his unilateral private conduct; it was effectuated through the officers' exercise of governmental authority, with Quinn's knowing and material participation in the state-assisted process.

240. The alleged seizure therefore resulted from joint private and governmental action rather than Quinn's unilateral conduct or the officers' mere presence to preserve the peace. A private party who knowingly and willfully participates with state officials in effectuating a constitutional deprivation acts under color of state law for purposes of § 1983. See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–42 (1982); *Booker v. City of Atlanta*, 776 F.2d 272, 273–74 (11th Cir.

1985); *Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263, 1277–78 (11th Cir. 2003). Quinn's purely private conduct, standing alone, is not pleaded as a Fourth Amendment violation.

**E. Municipal Liability — Town of Belleair**

241. Plaintiff incorporates the municipal-liability allegations set forth in paragraphs 202 through 208. The Town-attributable policy, custom, authorized governmental action or deliberate decision alleged in paragraphs 202 through 208, together with the incorporated factual allegations supporting municipal attribution, caused and was the moving force behind the Fourth Amendment deprivation alleged in this Count. See *Monell v. Department of Social Services*, 436 U.S. 658, 690–94 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–84 (1986).

**F. Resulting Injury**

242. As a direct and proximate result of the unreasonable seizures alleged in this Count, Plaintiff sustained involuntary residential displacement; loss of possession, access, use, and control of personal property; consequential economic harm; property loss and damage; emotional distress; humiliation; loss of security; and other legally cognizable injuries.

## VIII. COUNT III — FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS (42 U.S.C. § 1983)

**Defendants:** Mark Quinn, Town of Belleair, Rick Doyle, Brian Beery, Miranda Wincek, James Rudd, Paul Langlois, Rich Rogers and Joe Torch.

243. Plaintiff realleges and incorporates by reference paragraphs 18 through 208 as though fully set forth herein.

**A. Protected Property Interest**

244. At the time of the challenged governmental action, Plaintiff maintained a constitutionally

protected property interest in her continued occupancy of the residence. Property interests protected by the Fourteenth Amendment arise from independent sources of law and mutually explicit understandings supporting a legitimate claim of entitlement. See *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Perry v. Sindermann*, 408 U.S. 593, 601–02 (1972).

245. The Eleventh Circuit recognizes continued residential occupancy as a protected property interest and, applying Florida law, has held that even a tenancy at will may constitute a protected possessory interest. See *Ward v. Downtown Development Authority*, 786 F.2d 1526, 1530–31 (11th Cir. 1986); *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). As alleged in the incorporated factual allegations, Plaintiff remained in actual possession, had not abandoned the premises, and had not voluntarily surrendered her occupancy. The parties' disagreement concerning the precise characterization or duration of the housing arrangement did not, standing alone, extinguish the possessory interest Plaintiff continued to exercise.

**B. State Action and Governmental Deprivation**

246. A procedural due process claim requires a deprivation of a constitutionally protected property interest, state action, and constitutionally inadequate process. See *Grayden*, 345 F.3d at 1232.

247. Wincek, Rudd, Langlois, Rogers, Torch and Beery acted under color of state law through the exercise of authority made possible by their positions with the Town's Police Department. As alleged in the incorporated factual allegations, their conduct extended beyond neutral presence or preservation of the peace and affirmatively caused, facilitated or implemented the termination of Plaintiff's continued occupancy despite her repeated refusal to relinquish possession.

248. The individual Defendants materially participated in that deprivation through their respective conduct asserted herein. Langlois commanded Plaintiff to depart and coordinated the

arrangements effectuating her removal; Wincek prevented Plaintiff from reentering the residence and controlled her limited access to retrieve belongings; Rudd reinforced the compulsory-departure directive; Rogers and Torch participated in governmental interference with Plaintiff's possession and control of property while the removal proceeded; and Beery exercised on-scene supervisory authority with contemporaneous knowledge of Plaintiff's repeated objections and refusal to relinquish possession.

249. Each individual Defendant's liability is predicated upon that person's own participation in, direction or authorization of, or affirmative causal contribution to the deprivation, and not upon collective attribution, presence, supervisory title or respondeat superior. See *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Keating v. City of Miami*, 598 F.3d 753, 762–65 (11th Cir. 2010).

**C. Constitutionally Inadequate Process**

250. The Fourteenth Amendment requires constitutionally adequate notice and a meaningful opportunity to be heard in connection with governmental deprivation of a protected property interest. Except where sufficiently urgent circumstances or the impracticability of advance procedures justify postponement, that opportunity must be afforded at a meaningful time before the deprivation becomes effective. See *Fuentes v. Shevin*, 407 U.S. 67, 80–82, 90–92 (1972); *Mathews v. Eldridge*, 424 U.S. 319, 333–35 (1976).

251. Plaintiff received no neutral or adjudicative opportunity to contest the governmental termination of her continued occupancy before it was effectuated. No court had determined the parties' competing rights to possession, and no judgment for possession, writ, order, warrant or other judicial process authorized her removal.

252. Florida law supplied an established mechanism through which a claimed entitlement to

residential possession could be adjudicated and competing defenses heard before possession was restored through judicial process. See Fla. Stat. §§ 83.59–83.62. Plaintiff does not allege that violation of state procedure, standing alone, constitutes a federal due process violation. Those provisions are relevant because they demonstrate that the disputed possessory question was susceptible to neutral pre-deprivation adjudication rather than requiring immediate resolution through police authority.

253. The *Mathews* factors further support Plaintiff's claim. Her private interest in continued possession of her residence was substantial; the risk of erroneous deprivation was significant because materially conflicting claims of entitlement remained unresolved; neutral adjudication had substantial value in preventing an erroneous dispossession; and the governmental interest in responding to the reported assault and maintaining immediate safety did not require police officers to conclusively determine the separate question of residential possession at the scene. See *Mathews*, 424 U.S. at 335.

254. The deprivations asserted herein was not an unforeseeable or fortuitous loss of property occurring before procedural safeguards could practicably operate. Plaintiff was identified, physically present, expressly claiming possession, repeatedly refusing to surrender it, and directly contesting the asserted authority to remove her. The challenged deprivation occurred when governmental actors affirmatively exercised police authority to resolve that disputed possessory status against her.

255. Although adequate post-deprivation remedies may satisfy procedural due process where a deprivation results from truly random and unauthorized conduct for which advance safeguards are impracticable, that doctrine does not control where the State feasibly can provide meaningful process before the deprivation. See *Zinermon v. Burch*, 494 U.S. 113, 127–32 (1990);

*Rittenhouse v. DeKalb County*, 764 F.2d 1451, 1455–56 (11th Cir. 1985); *Carcamo v. Miami-Dade County*, 375 F.3d 1104, 1105–06 (11th Cir. 2004). Plaintiff maintains that the deprivations that are challenged here occurred at a foreseeable and identifiable point through the deliberate exercise of governmental authority under circumstances in which pre-deprivation process was practicable.

256. Accordingly, Plaintiff contends that Defendants deprived her of a protected residential property interest through state action without constitutionally adequate process before the deprivation became effective.

**D. Joint Action — Quinn**

257. Although Quinn is a private individual, Plaintiff alleges § 1983 liability only to the extent he knowingly and willfully participated with Town officers in the state-assisted deprivation challenged in this Count. As asserted in the incorporated factual allegations, his conduct extended beyond reporting a dispute or requesting neutral police assistance: Quinn sought Plaintiff's immediate removal, characterized her conduct to Town personnel as an attempted crime notwithstanding the disputed civil possessory status, and coordinated with responding officers concerning her departure, lodging, transportation and property—without her knowledge, consent or requests—while she expressly refused to relinquish possession.

258. The termination of Plaintiff's occupancy in the manner alleged depended upon the officers' exercise of governmental authority rather than Quinn's unilateral private power. Quinn materially participated in that state-assisted process and obtained the governmental intervention through which the disputed possessory status was immediately resolved in his favor without prior adjudication.

259. A private party who knowingly and willfully participates in joint activity with state

officials may act under color of state law for purposes of § 1983. See *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–42 (1982); *Harvey v. Harvey*, 949 F.2d 1127, 1133 (11th Cir. 1992). Quinn's purely unilateral private conduct, standing alone, is not pleaded as a Fourteenth Amendment violation.

**E. Municipal Liability — Town of Belleair**

260. The Town-attributable policy, custom, authorized governmental action or deliberate decision alleged in paragraphs 202 through 208, together with the incorporated factual allegations supporting municipal attribution, caused and was the moving force behind the procedural due process deprivation alleged in this Count. See *Monell v. Department of Social Services*, 436 U.S. 658, 690–94 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–84 (1986).

**F. Resulting Injury**

261. As a direct and proximate result of the deprivation alleged in this Count, Plaintiff sustained involuntary residential displacement; loss of continued occupancy and residential security; loss of possession, access, use and control of personal property; consequential economic harm; emotional distress; humiliation; and other legally cognizable injuries resulting from the denial of constitutionally adequate process.

## IX. COUNT IV — ASSAULT (FLORIDA COMMON LAW)

**Defendant:** Mark Quinn

262. Plaintiff realleges and incorporates by reference paragraphs 18 through 201 as though fully set forth herein.

263. Under Florida law, civil assault consists of an intentional and unlawful offer of corporal injury by force, or force directed toward another under circumstances creating a reasonable

apprehension of imminent physical harm, coupled with the apparent present ability to carry out the threatened contact. See *Lay v. Kremer*, 411 So. 2d 1347, 1349 (Fla. 1st DCA 1982).

264. As asserted in the incorporated factual allegations, Quinn confronted Plaintiff at close range, advanced towards her while holding the laptop tray, and shoved the tray directly towards her chest until immediate physical contact occurred. Plaintiff perceived Quinn's advancing conduct before the ensuing impact and reasonably apprehended that immediate physical violence was imminent. Quinn possessed the apparent present ability to carry out that threatened contact.

265. Quinn's intentional conduct therefore constituted civil assault under Florida law.

266. As a direct and proximate result of Quinn's assault, Plaintiff experienced immediate and well-founded apprehension of physical violence, fear for her personal safety, emotional distress, humiliation, and loss of security, together with other compensable damages resulting from the threatened and imminent use of force.

**X. COUNT V — BATTERY (FLORIDA COMMON LAW)**

Defendant: Mark Quinn

267. Plaintiff realleges and incorporates by reference paragraphs 18 through 201 as though fully set forth herein.

268. Under Florida law, battery consists of harmful or offensive contact with another undertaken with the intent to cause such contact or the apprehension that such contact is imminent. See *Paul v. Holbrook*, 696 So. 2d 1311, 1312 (Fla. 5th DCA 1997); *Quilling v. Price*, 894 So. 2d 1061, 1063 (Fla. 5th DCA 2005).

269. As asserted in the incorporated factual allegations, Quinn intentionally and forcefully struck Plaintiff in the chest with the laptop tray without her consent, causing her to fall backward down the concrete stairs. That deliberate physical contact was harmful and offensive and

constituted battery under Florida law.

270. Liability does not depend upon Quinn having intended the precise nature or extent of the injuries ultimately resulting from the intentional contact. Florida law distinguishes the intent necessary to commit an intentional tort from an intent to cause the particular resulting harm. See *Spivey v. Battaglia*, 258 So. 2d 815, 817 (Fla. 1972).

271. Quinn's intentional battery directly and proximately caused the physical injuries and resulting harm asserted in the incorporated factual allegations. As a result, Plaintiff sustained physical injury to her buttocks and lower back, pain and suffering, physical impairment, inconvenience, interference with ordinary activities of daily living, emotional distress, and other compensable damages.

## XI. COUNT VI — CONVERSION (FLORIDA COMMON LAW)

**Defendant:** Mark Quinn

272. Plaintiff realleges and incorporates by reference paragraphs 18 through 201 as though fully set forth herein.

273. At all relevant times, Plaintiff owned, possessed or maintained the immediate right to possess the personal property kept within the bedroom and residence.

274. Under Florida law, conversion occurs through a wrongful exercise of dominion or control over another's property inconsistent with that person's ownership or immediate possessory rights. The tort requires a positive and overt exercise of authority resulting in wrongful deprivation of possession or control. See *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009); *Goodrich v. Malowney*, 157 So. 2d 829, 831–32 (Fla. 2d DCA 1963); *Orozco v. McCormick 105, LLC*, 276 So. 3d 932, 935–36 (Fla. 3d DCA 2019).

275. As asserted in the incorporated factual allegations, Quinn intentionally exercised

unauthorized dominion over Plaintiff's personal property by opening and searching packed belongings; disturbing and rearranging their contents; handling personal papers, sensitive materials, intimate garments and other effects; removing possessions from the places and condition in which Plaintiff had left them; placing property outside over her express objection; and retaining additional belongings within the residence without her knowledge and beyond her access. Through that conduct, Quinn assumed control over the location, condition, custody, and disposition of property as to which Plaintiff maintained the superior and immediate right of possession, thereby wrongfully depriving her of possession, use, access and control.

276. A separate demand and refusal were unnecessary because the conduct alleged constituted affirmative exercises of dominion inconsistent with Plaintiff's rights independently of any subsequent refusal to return the property. See *Goodrich*, 157 So. 2d at 832; *Mayo v. Allen*, 973 So. 2d 1257, 1259 (Fla. 1st DCA 2008).

277. Quinn's unauthorized dominion directly and proximately caused the loss of possession, use, and control alleged in the incorporated factual allegations. Plaintiff seeks the value of property proven to have been converted, recoverable loss-of-use and consequential damages where permitted by law, prejudgment interest where applicable, and all other compensatory relief established by the evidence.

## XII. COUNT VII — TRESPASS TO CHATTELS (FLORIDA COMMON LAW)

**Defendant:** Mark Quinn

278. Plaintiff realleges and incorporates by reference paragraphs 18 through 201 as though fully set forth herein.

279. Plaintiff possessed and maintained the immediate right to possess the personal property at issue. Quinn had no authorization from Plaintiff to take, use, open, rearrange, relocate, remove,

retain or otherwise physically interfere with those chattels in the manner alleged.

280. Trespass to chattels encompasses intentional dispossession of another's personal property and intentional physical use of or intermeddling with a chattel in another's possession. See Restatement (Second) of Torts § 217; *C.I.T. Corp. v. Brewer*, 146 Fla. 247, 250–52, 200 So. 910, 911–12 (1941).

281. As alleged in the incorporated factual allegations, Quinn intentionally intermeddled with Plaintiff's personal property without authorization by opening and physically handling packed belongings; disturbing and rearranging their contents; examining personal papers, sensitive materials, intimate garments and other effects; and physically moving, removing and retaining chattels despite Plaintiff's express objections. His conduct constituted direct and intentional interference with property in which Plaintiff maintained the immediate possessory interest.

282. The interference was neither accidental nor incidental and resulted in dispossession, loss of use and control, and impairment of Plaintiff's protected possessory interests. See Restatement (Second) of Torts § 218.

283. To the extent any particular interference is determined not to have been sufficiently substantial to constitute conversion, Plaintiff pleads trespass to chattels as an alternative basis of liability for Quinn's unauthorized physical interference with, dispossession of, or impairment of her possessory interests in the affected property.

284. As a direct and proximate result of Quinn's conduct, Plaintiff sustained loss of possession, access, use, and control of personal property; interference with the integrity and condition of her belongings; consequential loss resulting from the dispossession and unauthorized handling; and other compensable damages established by the evidence.

## XIII. COUNT VIII — FALSE REPORT TO LAW ENFORCEMENT (FLORIDA COMMON LAW)

**Defendant:** Mark Quinn

285. Plaintiff realleges and incorporates by reference paragraphs 18 through 201 as though fully set forth herein.

**1. False Reporting and Actual Knowledge**

286. Under Florida law, a person injured by a false report of criminal behavior to law enforcement may recover where the reporting party possesses knowledge of the falsity, reasonably should know the accusation is false or acts with the gross, flagrant, wanton or reckless disregard for another's rights recognized in *Valladares v. Bank of America Corp.*, 197 So. 3d 1, 2, 10–14 (Fla. 2016). The qualified protection afforded to mistaken but good-faith reports of suspected criminal activity does not extend to culpably false or reckless criminal accusations of that character. See *Valladares*, 197 So. 3d at 10–14; *Lozada v. Hobby Lobby Stores, Inc.*, 702 F. App'x 904, 913 (11th Cir. 2017).

287. As asserted in the incorporated factual allegations, Quinn possessed direct and firsthand knowledge of the parties' residential arrangement, its duration and terms, Plaintiff's established occupancy, and the absence of any prior agreement requiring her departure by June 30. Nevertheless, when invoking law-enforcement intervention concerning that occupancy, Quinn represented that Plaintiff "was supposed to be gone Jun 30" and thereafter characterized her continued presence to law enforcement as that of a nonresident "attempting to commit a crime."

288. Those representations did not concern collateral or immaterial details. They altered the factual premise governing Plaintiff's right to remain and supplied law enforcement with a materially different characterization of an existing civil possessory dispute—one portraying

Plaintiff's continued occupancy as unauthorized and criminal rather than as a contested residential interest.

289. Quinn also made a formal police report concerning Plaintiff and the residential dispute on July 2, 2026, identified as Belleair Police Department Report No. BE26-7438. Despite Plaintiff's subsequent public-records request, the Town did not produce that report. Plaintiff therefore does not presently attribute any specific statement to Quinn based upon the undisclosed contents of BE26-7438. The nature and substance of his representations therein remain within Defendants' possession or control and subject to evidentiary development.

290. Quinn was not an uninformed third party reporting facts supplied by others. He personally participated in the housing arrangement, possessed the communications reflecting its terms, knew when and under what circumstances he first sought to terminate it, and therefore had direct knowledge of facts materially inconsistent with the criminal characterization he supplied to law enforcement. His conduct is accordingly alleged as knowing and intentional or, alternatively, as demonstrating the gross and reckless disregard for Plaintiff's rights required by *Valladares*, rather than mistake, misunderstanding or ordinary negligence.

291. Quinn's conduct further exceeded the mere provision of neutral information for independent police evaluation. He invoked governmental intervention concerning Plaintiff's continued occupancy, supplied materially false or misleading information bearing directly upon the asserted lawfulness of her presence, characterized that presence as criminal, and continued seeking official assistance directed toward securing her departure.

292. The resulting police intervention concerned the precise residential status Quinn had placed before law enforcement. Town officers subsequently exercised governmental authority concerning Plaintiff's continued occupancy and ultimately compelled her departure despite her

express refusal to relinquish possession. The law-enforcement response was therefore sufficiently connected to the subject, purpose, and foreseeable consequences of Quinn's culpably false reporting to support proximate causation. See *Valladares*, 197 So. 3d at 10–14.

293. Plaintiff does not predicate this Count upon the unidentified contents of any report withheld from her. Liability rests upon Quinn's statements and representations independently known to Plaintiff or reflected in presently available records; the contents of any unreleased police report remain subject to evidentiary development.

294. As a direct and proximate result of Quinn's culpably false reporting and the foreseeable sequence of events and law-enforcement intervention it precipitated or materially contributed to, Plaintiff sustained physical injury and continuing pain; involuntary residential displacement; loss of possession, access, use, and control of personal property; consequential economic loss; emotional distress; humiliation; loss of security; disruption of daily life; inconvenience; and other compensable damages legally attributable to Quinn's conduct and its foreseeable consequences.

## XIV. COUNT IX — DEFAMATION, DEFAMATION BY IMPLICATION AND SLANDER (FLORIDA COMMON LAW)

**Defendant: Mark Quinn**

295. Plaintiff realleges and incorporates by reference paragraphs 18 through 92 as though fully set forth herein.

296. Under Florida law, defamation requires publication to a third party of false and defamatory matter concerning the plaintiff, actionable fault, and resulting injury as required by law. Florida additionally recognizes defamation by implication where otherwise accurate statements are juxtaposed, selectively presented or accompanied by material omissions so as to

communicate a materially false and defamatory impression. See *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106–08 (Fla. 2008); *Ozyesilpinar v. Reach PLC*, 365 So. 3d 453, 459–60 (Fla. 3d DCA 2023).

**A. Direct Defamatory Publications**

297. Quinn published statements concerning Plaintiff to law-enforcement personnel that were factual in character and susceptible to verification. Among the known publications, Quinn represented that Plaintiff was a nonresident "attempting to commit a crime" and supplied information portraying her continued occupancy as unauthorized notwithstanding his firsthand knowledge of the parties' residential arrangement and Plaintiff's established possession of the residence.

298. Quinn also made a formal police report concerning Plaintiff and the residential dispute on July 2, 2026, identified as Belleair Police Department Report No. BE26-7438. The Town did not produce that report in response to Plaintiff's public-records request. Plaintiff therefore does not attribute any unidentified statement to Quinn based upon its undisclosed contents; liability under this Count rests upon publications independently known to Plaintiff or reflected in presently available records, while the report's contents remain subject to evidentiary development.

299. The challenged statements were reasonably capable of conveying that Plaintiff was unlawfully occupying another person's residence and engaging in criminal conduct rather than asserting rights arising from an existing residential arrangement. Such assertions concerned objectively verifiable events and circumstances and were not protected rhetorical hyperbole or non actionable pure opinion.

**B. Defamation by Implication and Café Publication**

300. Quinn separately published statements concerning Plaintiff to unrelated café patrons and

employees. In their presence, he announced that he had made a police report "against" Plaintiff and stated that she was required to speak with Officer Wincek before returning to the residence.

301. Plaintiff does not predicate this theory upon the literal falsity of the isolated fact that Quinn had contacted law enforcement. Rather, liability arises from the materially false impression created by Quinn's deliberate juxtaposition of the police report with his assertion that Plaintiff was required to speak with Officer Wincek before returning to her residence. Considered together and in context, those statements conveyed that Plaintiff had engaged in wrongdoing warranting police intervention and that law enforcement had restricted or conditioned her return. That implication was demonstrably false. On July 2, 2026, at 2:01 p.m., after Plaintiff informed Wincek by email that Quinn had stated, "He said I had to speak with you before returning to the house," Wincek expressly responded, "No, I didn't say that." Quinn therefore publicly attributed to law enforcement a restriction that the identified officer contemporaneously denied imposing.

302. The defamatory meaning was further reinforced by Quinn's omission of material context personally known to him: Plaintiff was residing at the property pursuant to an existing housing arrangement; possessed a key; maintained her belongings there; had not voluntarily surrendered occupancy; and had never agreed that her right to reside there was conditioned upon a romantic or sexual relationship with Quinn. As maintained herein, Quinn sought to terminate the arrangement only after Plaintiff rejected his unwanted sexual advances and declined a romantic relationship. He thereafter publicly presented the resulting civil possessory dispute as one involving police intervention and restrictions upon Plaintiff's return, while omitting the circumstances giving rise to his demand that she leave.

303. Florida law imposes liability where a speaker has the individual facts substantially correct

but creates a false defamatory meaning through their arrangement, juxtaposition or omission of material context. See *Jews for Jesus*, 997 So. 2d at 1106–08.

**C. Falsity and Actionable Fault**

304. The challenged publications were materially false in fact, implication or both. Quinn possessed direct and personal knowledge of the underlying residential arrangement, Plaintiff's actual occupancy, the circumstances under which she had been permitted to reside there, and the timing and basis upon which he later sought to terminate that arrangement.

305. Quinn was therefore not relying upon information supplied by an unknown third party or attempting to interpret events beyond his knowledge. He was a direct participant in the very facts he materially mischaracterized.

306. Plaintiff was a private person. At minimum, Quinn failed to exercise reasonable care concerning the truth or falsity of the challenged publications. The pleaded facts support the substantially greater inference that he knew the material representations and implications were false or acted in reckless disregard of their truth because the contrary underlying facts were personally known to him when he published them. See *Jews for Jesus*, 997 So. 2d at 1106.

307. To the extent any characterization is construed as opinion in form, it nevertheless conveyed or rested upon undisclosed defamatory factual premises concerning Plaintiff's supposed lack of residential rights and alleged criminal conduct and is therefore not insulated merely by being expressed as an opinion or conclusion. See *Ozyesilpinar*, 365 So. 3d at 459–60.

**D. Qualified Privilege and Express Malice**

308. Plaintiff recognizes that a private individual's voluntary statements to law enforcement made before the institution of criminal proceedings are presumptively subject to a qualified privilege. The privilege is defeated where the publication is false and made with common-law

express malice—that is, where the speaker's primary motive is to injure the plaintiff's reputation. See *Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla. 1992); *Nodar v. Galbreath*, 462 So. 2d 803, 810–12 (Fla. 1984).

309. Plaintiff asserts express malice based upon the circumstances surrounding Quinn's publications, including his firsthand knowledge of facts materially inconsistent with the accusations he supplied to law enforcement; his transformation of a private civil occupancy dispute into an accusation of criminal wrongdoing; and his contemporaneous dissemination of the existence and asserted significance of his police report to unrelated members of the public who possessed no legitimate interest in the dispute.

310. Quinn's gratuitous public invocation of the police report before café patrons and employees served no law-enforcement, protective or investigative purpose. That separate publication is asserted as circumstantial evidence that reputational injury and the portrayal of Plaintiff as a wrongdoer were not incidental consequences of his communications but a material and primary purpose of the challenged course of publication.

311. Plaintiff further alleges that Quinn used the privileged occasion, to the extent one existed, as a vehicle for materially false accusations rather than for a good-faith transmission of accurately reported facts. The allegations therefore support abuse and forfeiture of the qualified privilege. See *Fridovich*, 598 So. 2d at 69; *Nodar*, 462 So. 2d at 811–12.

312. No law-enforcement-reporting privilege extends to Quinn's separate publication of the police-related accusations and implications to unrelated café patrons and employees.

**E. Defamation Per Se**

313. Quinn expressly attributed criminal conduct to Plaintiff by representing to law enforcement that she was a nonresident "attempting to commit a crime." The publication was

factual in character and capable of being understood as an accusation of criminal wrongdoing rather than opinion, exaggeration, or rhetorical hyperbole.

314. Under Florida law, oral defamation is actionable per se where, considered in its full context, it imputes a criminal offense falling within a recognized per-se category. The defamatory character may arise directly or through surrounding circumstances and innuendo. See *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497–98 (Fla. 1953); *Joopanenko v. Gavagan*, 67 So. 2d 434, 435–36 (Fla. 1953).

315. To the extent Quinn's challenged publications are determined to impute an infamous crime, felony or other criminal conduct falling within a recognized category of defamation per se, Plaintiff pleads that theory in the alternative and seeks the general damages available under applicable Florida and federal constitutional law.

316. Plaintiff does not rely exclusively upon presumed damages and independently alleges actual reputational and consequential injury.

**F. Causation and Damages**

317. Quinn's defamatory publications directly and proximately injured Plaintiff's reputation and standing among persons to whom the statements and implications were communicated. Following the café publication, Plaintiff observed a material change in the conduct of patrons and employees who had previously interacted with her, including withdrawal of prior social interaction, altered treatment and diminished trust, providing concrete factual evidence of reputational injury rather than presumed harm alone.

318. As a direct and proximate result of Quinn's conduct, Plaintiff sustained impairment of reputation and standing in the community; humiliation; embarrassment; mental anguish and emotional distress; loss of trust and social regard among persons exposed to the publications; and

consequential damages attributable to the defamatory statements and implications.

319. To the extent the challenged publications are determined actionable per se, Plaintiff additionally seeks general damages recoverable without proof of special pecuniary loss to the extent permitted by applicable law, together with all other compensatory and punitive relief established by the evidence and legally available.

## XV. DAMAGES

**Defendants:** Mark Quinn, Town of Belleair, Rick Doyle, Brian Beery, Miranda Wincek, James Rudd, Paul Langlois, Rich Rogers and Joe Torch.

### A. Compensatory, Consequential, General, Nominal and Statutory Damages

320. As a direct and proximate result of the conduct alleged in the foregoing Counts, Plaintiff has suffered and continues to suffer actual, compensable injuries and losses, including the following:

321. **Physical Injury, Pain and Impairment:** Plaintiff sustained injuries from the July 7 assault and resulting fall down the concrete stairs, including bruising and injury to her lower buttocks and lower back, impact to the back of her head, injury to her left wrist, and cuts and abrasions. She continues to experience pain, sleep disruption, physical limitation, inconvenience, and interference with sitting, standing, bicycling, writing, work and other ordinary activities.

322. **Emotional and Constitutional Injury:** Plaintiff sustained humiliation, mental anguish, emotional distress, involuntary displacement, loss of residential and personal security, interference with possessory interests, disruption of daily life, and diminished enjoyment of ordinary activities. Plaintiff has also avoided returning to Belleair establishments and declined social invitations there because of apprehension about encountering Quinn or the involved officers. Plaintiff seeks compensation only for actual injury caused by the constitutional

violations alleged herein, not for the abstract value of the rights themselves. See *Carey v. Piphus*, 435 U.S. 247, 254–64 (1978); *Memphis Community School District v. Stachura*, 477 U.S. 299, 306–08 (1986).

323. **Defamation and Reputational Injury:** Plaintiff sustained impairment of reputation, humiliation, embarrassment, diminished trust and social standing, and related emotional harm caused by Quinn's defamatory publications. The materially changed treatment Plaintiff experienced from persons exposed to the café publications further evidences actual reputational injury. To the extent any publication constitutes defamation per se, Plaintiff seeks all general or presumed damages available under Florida law, without duplicative recovery.

324. **Property Loss and Damage:** Plaintiff sustained loss of possession, access, use, control and value of personal property, including missing clothing and an original commissioned illustration later returned effectively destroyed. Because the illustration passed from Quinn's possession into Town custody before its damaged condition was discovered, Plaintiff presently cannot determine which custodian caused the destruction and seeks recovery against the legally responsible Defendant or Defendants as established by the evidence.

325. **Economic and Consequential Losses:** Plaintiff incurred transportation, food, rental car fees, property related and other out-of-pocket expenses resulting from her displacement, injuries and loss or impairment of property, together with other consequential economic losses established by the evidence.

326. **Damages:** To the extent Plaintiff proves a completed violation of a federally protected right without compensatory injury attributable to that particular violation, she seeks nominal damages. See *Carey*, 435 U.S. at 266–67; *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292–93 (2021).

327. **Statutory Damages, Interest, Costs and Fees:** To the extent Part II of Chapter 83, Florida Statutes, governs the parties' residential relationship, Plaintiff seeks all relief authorized by Fla. Stat. §§ 83.55 and 83.67, including actual and consequential damages or three months' rent, whichever is greater, and separate awards for qualifying noncontemporaneous violations. Plaintiff further seeks prejudgment interest where authorized, postjudgment interest pursuant to 28 U.S.C. § 1961, taxable costs, attorney's fees incurred through retained counsel where authorized by 42 U.S.C. § 1988, Fla. Stat. § 83.67, or other applicable law, and all other available relief at law or equity.

328. Plaintiff seeks all compensatory, consequential, general, nominal, statutory and presumed damages established by the evidence and authorized by law, without duplicative recovery for the same injury.

**B. Punitive Damages**

329. Plaintiff seeks punitive damages against the individual defendants: Quinn, Wincek, Rudd, Langlois, Rogers, Torch, Beery and Doyle, whom such damages are legally available.

330. Under 42 U.S.C. § 1983, punitive damages are sought where an individual Defendant's conduct is proven to have been motivated by evil motive or intent or to have involved reckless or callous indifference to Plaintiff's federally protected rights. See *Smith v. Wade*, 461 U.S. 30, 56 (1983).

331. On Plaintiff's Florida-law claims against Quinn, punitive damages are sought upon proof of intentional misconduct or gross negligence under Fla. Stat. § 768.72 and the applicable clear-and-convincing-evidence standard. See Fla. Stat. § 768.725.

332. Plaintiff does not seek punitive damages against the Town of Belleair. See *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

## XVI. PRAYER FOR RELIEF

**Defendants:** Mark Quinn, Town of Belleair, Rick Doyle, Brian Beery, Miranda Wincek, James Rudd, Paul Langlois, Rich Rogers and Joe Torch.

333. WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against Defendants on each claim upon which Plaintiff is entitled to relief;

B. Award Plaintiff compensatory, actual, and consequential damages in an amount to be determined at trial;

C. Award punitive damages against Quinn and those individual Defendants against whom punitive damages are legally available, in an amount to be determined at trial;

D. Award nominal damages where authorized by law;

E. Award statutory damages and all recoverable costs as authorized by law;

F. Enter appropriate declaratory and permanent injunctive relief, including:

(1) enjoining Quinn from contacting Plaintiff, directly or indirectly, except through counsel or as expressly authorized by the Court;

(2) enjoining Quinn from approaching, following, surveilling, threatening, harassing, or intentionally coming within a reasonable distance of Plaintiff at her residence, place of employment or other locations specifically identified to the Court;

(3) enjoining Quinn from interfering with Plaintiff's person, residence, personal property or mail;

(4) enjoining the individual Town Defendants, and Town personnel acting at their direction or in concert with them, from retaliating against Plaintiff for exercising her First Amendment rights, pursuing this action or otherwise petitioning the government for redress, and from

engaging in retaliatory contact, surveillance, intimidation, harassment or interference with Plaintiff at her residence, places of employment or other locations she lawfully frequents; and

(5) enjoining the Town Defendants from engaging in or authorizing further retaliation or unconstitutional interference with Plaintiff's exercise of federally protected rights;

G. Award Plaintiff reasonable attorney's fees, to the extent incurred through retained counsel and recoverable under 42 U.S.C. § 1988, Fla. Stat. § 83.67(6), or other applicable authority;

H. Award prejudgment and post-judgment interest as permitted by law; and

I. Grant such other and further relief as the Court deems just and proper.

Executed on September 22, 2026

Respectfully submitted,

Monique Arge